# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-60140
c/w No. 13-60141

United States Court of Appeals
Fifth Circuit

**FILED**

August 1, 2014

Lyle W. Cayce
Clerk

LOUISIANA PUBLIC SERVICE COMMISSION,

Petitioner

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

Before WIENER, HAYNES, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

In these petitions for review the Louisiana Public Service Commission (the "Louisiana Commission") challenges the Federal Energy Regulatory Commission's ("FERC") interpretation of contractual language. Holding, among other things, that FERC's interpretation is not arbitrary, unreasonable, or contrary to law, we DENY in part and DISMISS in part the Louisiana Commission's petitions for review.

No. 13-60140 c/w No. 13-60141

## FACTS AND PROCEEDINGS

### A.    The Entergy System and the System Agreement

Entergy Corporation ("Entergy Corporation")[1] sells electricity in Arkansas, Louisiana, Mississippi, and Texas through its six operating companies. 120 FERC ¶ 61,079 at PP 1, 3 (2007). The "System Agreement," which was first executed in 1951, governs dealings between the operating companies and establishes an operating committee that comprises representatives from Entergy Corporation and each operating company. *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 383 (D.C. Cir. 2008) ("*La. 2008*"). Each operating company accounts for the costs of generation plants in its jurisdiction, and the committee spreads investment costs among the operating companies by assigning new plants on a rotating basis and dispersing costs associated with facilities that benefit the entire Entergy System. *Id.*; *see Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 42 (2003). These efforts ideally achieve a rough equalization of costs among the operating companies.

### B.    FERC's Regulatory Role

The Federal Power Act ("FPA"), 16 U.S.C. §§ 824–824w, provides FERC statutory authority over the transmission and sale of electric energy at wholesale in interstate commerce. FERC regulates all rates and charges within its jurisdiction by confirming that they are "just and reasonable" and not unduly discriminatory or preferential. §§ 824d, 824e; *see also New York v. FERC*, 535 U.S. 1, 33 (2002) (Thomas, J., dissenting) (noting FERC's "statutory mandate to regulate when it finds unjust, unreasonable, unduly discriminatory, or preferential treatment"). Section 206 of the FPA provides FERC authority to independently investigate rates, § 824d(e), but a

---

[1] For ease of reference, we also refer to Entergy Services, Inc., which is Entergy Corporation's wholly owned subsidiary, as "Entergy Corporation."

2

complainant may urge FERC to investigate a rate in a Section 206 proceeding. In a Section 206 proceeding the burden is on the complainant to demonstrate that the rate is "unjust, unreasonable, unduly discriminatory, or preferential." § 824e(b). If FERC finds that the rate is unlawful, it must set a just, reasonable, nondiscriminatory rate. § 824e(a).

## C.    Entergy Louisiana Acquires the Vidalia Power Plant

In 1985, Entergy Louisiana purchased most of the output from the Vidalia Hydroelectric Power Plant ("Vidalia"). "Vidalia was a local affair"; Entergy Corporation was minimally involved in the purchase, and the Entergy System made no efforts to rely on resources similar to Vidalia. *La. 2008*, 522 F.3d at 396. The Louisiana Commission "approved a phased-in rate schedule for the costs of the plant, which limited its costs to Entergy Louisiana initially, but then increased them until they leveled off at the end of the long-term contract." *Id.* at 385. The Louisiana Commission also guaranteed the "full recovery of [Vidalia's] costs through Louisiana ratepayers." *Id.* at 396.

In 2002, the Louisiana Commission entered a settlement with Entergy Louisiana "granting the latter exclusive retention of Vidalia's accelerated tax deductions for the remaining life of the contract," which allowed tax benefits to flow to Louisiana ratepayers. *Id.* Another component of the settlement provided that Entergy Louisiana would "maintain its pre-existing capital structure" in any rate proceeding for a ten-year period. *In re Entergy La.*, No. U-20925, 2002 WL 31618829, at *10 (Sept. 18, 2002) ("*La. Pub. Serv. Comm'n 2002*"). Accordingly, and as discussed in detail below, "[a]s part of a rate case subsequent to that order," Entergy Louisiana's capital structure was adjusted. *Entergy Servs., Inc.*, 137 FERC ¶ 61,029 at P 74 (2011) ("*Opinion No. 514*").

## D.    FERC Imposes the "Bandwidth Remedy"

Over the 50-year operation of the Entergy System FERC twice has fixed an inequitable rate. In 1985, FERC attempted to remedy disparities in nuclear-

No. 13-60140 c/w No. 13-60141

capacity costs among the operating companies by ordering nuclear-investment equalization in the Entergy System. *La. 2008*, 522 F.3d at 384. In 2005, FERC acted again, this time by fashioning a "bandwidth remedy" in response to a complaint initiated by the Louisiana Commission. At the initial stage of the complaint proceeding, an administrative law judge found that fuel-cost disparities among the operating companies had left production costs unequal and imposed a "numerical bandwidth remedy" to roughly equalize production costs across the operating companies. *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 106 FERC 63,012 at P 25, 51 (2004). The bandwidth remedy "ensure[d] that for each calendar year beginning with 2003, no Entergy Operating Company is more than +/− 7.5% relative to [the] System average [production costs]." *Id.* at P 50.

FERC subsequently affirmed the administrative law judge's finding that production costs were no longer just and reasonable and affirmed the imposition of a bandwidth remedy. *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 111 FERC ¶ 61,311 at P 1 (2005) ("*Opinion No. 480*"). FERC, however, "reverse[d] [the administrative law judge's] determination on the appropriate bandwidth in favor of a broader bandwidth that eases the severity of the remedy's impact." *Id.* Instead of the 7.5% bandwidth, FERC "conclude[d] that a bandwidth remedy of +/- 11 percent allowing for a maximum of a 22 percent spread of production costs, between Operating Companies on an annual basis, is just and reasonable and will help keep the Entergy System in rough production cost equalization." *Id.* at P 144. FERC also excluded Vidalia from the Entergy System when applying the bandwidth remedy because Vidalia was exclusively an Entergy Louisiana resource. *Id.* at PP 173, 184. The D.C. Circuit held "FERC's adoption of the +/- 11 percent bandwidth to be within its discretion," and affirmed FERC's "determination that Vidalia was not planned as a System resource." *La. 2008*, 522 F.3d at 394, 397.

**E.    Entergy Corporation Implements the Bandwidth Remedy**

In 2006, Entergy Corporation amended the System Agreement to account for the bandwidth remedy, and FERC accepted the modifications in 2006 and 2007. *See La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 117 FERC ¶ 61,203 (2006) ("*2006 Compliance Order*"), *on reh'g and compliance*, 119 FERC ¶ 61,095 (2007) ("*2007 Compliance Order*"), *aff'd, La. Pub. Serv. Comm'n v. FERC*, 341 F. App'x 649, 649 (D.C. Cir. 2009) ("*La. 2009*"). Specifically, Entergy Corporation modified "Service Schedule MSS-3" to comply with Opinion No. 480's bandwidth remedy. The System Agreement now controls deviations in each operating company's production costs to contain them within +/-11% of the System average production costs. The System Agreement provides a formula for calculating the actual production costs for each company and the System's average production costs and specifies the billing procedure for paying or receiving funds as required to maintain the rough equalization of production costs. *See* Section 31.09(d). The System Agreement also provides that the operating companies' data reported in their annual FERC Form 1 will populate the bandwidth formula. *See, e.g.*, Section 30.12 n.1 ("All Rate Base, Revenue and Expense items shall be based on the actual amounts on the Company's Books for the twelve months ended December 31 of the previous year as reported in FERC Form 1.").

**1.    First Annual Bandwidth Proceeding**

At Entergy Corporation's first annual bandwidth proceeding, Entergy Corporation filed calculations of cost disparities and the operating companies' respective payments and receipts based on the previous year's production-cost data. An administrative law judge ruled on Entergy Corporation's submissions, *Entergy Servs. Inc.*, 124 FERC ¶ 63,026 (2007), and FERC affirmed in part and reversed in part. *Entergy Servs. Inc.*, 130 FERC ¶ 61,023 (2010) ("*Opinion No. 505*"), *on reh'g*, 139 FERC ¶ 61,103 (2012) ("*Opinion No.*

No. 13-60140 c/w No. 13-60141

*505-A*"), *order on compliance*, 139 FERC ¶ 61,104 (2012), *order on further reh'g*, 145 FERC ¶ 61,046 (2013). The Louisiana Commission petitioned for review of *Opinion Nos. 505 and 505-A* before the D.C. Circuit, and the petition is pending. *La. Pub. Serv. Comm'n v. FERC*, D.C. Cir. No. 12-1282 (D.C. Cir. Filed July 5, 2012).[2]

### 2.    Second Annual Bandwidth Proceeding

Entergy Corporation's second annual bandwidth proceeding commenced in 2008, and after an initial determination by the administrative law judge, FERC issued two of the orders now before us in this petition. *Opinion Nos. 514* and *514-A*.

### 3.    Third Annual Bandwidth Proceeding

In the third annual bandwidth proceeding in 2009, FERC denied an interlocutory appeal of an initial decision by the administrative law judge. *Entergy Servs. Inc.*, 130 FERC ¶ 61,170 (2010) ("*Third Bandwidth Interlocutory Order*"). FERC subsequently affirmed the administrative law judge's decision. *Entergy Servs., Inc.*, 139 FERC ¶ 61,105 (2012) ("*Opinion No. 518*"), *on reh'g*, 145 FERC ¶ 61,047 (2013). The Louisiana Commission petitioned for review of these orders in our Court (5th Cir. 13-60874) and a member of our Court denied FERC's motion to hold that appeal in abeyance pending the resolution of this appeal.[3]

### 4.    Fourth Annual Bandwidth Proceeding

In Entergy Corporation's fourth annual bandwidth proceeding FERC set the matter before an administrative law judge and ruled on the Louisiana Commission's request for rehearing on depreciation inputs. *Entergy Servs.,*

---

[2] The Louisiana Commission has also filed an appeal from the 2013 order on further rehearing that has been consolidated with its pending appeal of *Opinion Nos. 505* and *505-A*.

[3] No. 13-60874, order of January 23, 2014 (Dennis, J.).

No. 13-60140 c/w No. 13-60141

*Inc.*, 132 FERC ¶ 61,065 (2010), *on reh'g*, 137 FERC ¶ 61,019 (2011) ("*Fourth Bandwidth Rehearing Order*"), *on reh'g Entergy Servs. Inc.*, 145 FERC ¶ 61,049 (2013) (granting clarification).[4]

## F. Complaint Proceedings

Outside of the annual bandwidth proceedings, the Louisiana Commission has filed multiple complaints with FERC. In 2008, the Louisiana Commission challenged the methodology and inputs used for calculating production costs. "With regard to the seven issues covering methodology deviation and the justness and reasonableness of cost inputs raised by the Louisiana Commission," FERC found that these issues were already raised in the first bandwidth proceeding and dismissed the complaints because there was "no need to establish a separate proceeding to address them." *La. Pub. Serv. Comm'n v. Entergy Corp.*, 124 FERC 61,010 at P 27 (2008).

In 2010, the Louisiana Commission filed a complaint requesting uniform accounting standards in the bandwidth calculations notwithstanding retail depreciation rates. FERC set the matter for a "trial-type evidentiary hearing." *La. Pub. Serv. Comm'n v. Entergy Corp.*, 132 FERC ¶ 61,003 at P 2 (2010). After an initial decision, FERC affirmed the administrative law judge's conclusion that the Louisiana Commission had not "met its burden of proof under section 206 of the Federal Power Act . . . to show the existing bandwidth formula is unjust and unreasonable or unduly discriminatory or preferential." *La. Pub. Serv. Comm'n v. Entergy Corp.*, 139 FERC ¶ 61,107 at P 2 (2012) ("*Opinion No. 519*"), *reh'g pending*.

---

[4] In January 2014, the Louisiana Commission petitioned our court for a writ of mandamus requesting an order instructing FERC to remove from abeyance the fifth, sixth, and seventh annual bandwidth proceedings and two Louisiana complaint proceedings against Entergy Corporation. We denied mandamus relief on March 13, 2014. No.14-30073 (Jolly, Smith, and Clement, JJ.).

No. 13-60140 c/w No. 13-60141

In a 2011 complaint, the Louisiana Commission also challenged the inclusion of certain expenses and revenues that predated the imposition of the bandwidth remedy. FERC denied the request but left open the issue of prospective adjustments. *La. Pub. Serv. Comm'n v. Entergy Corp.*, 139 FERC ¶ 61,102 at PP 26–28 (2012), *reh'g pending*.

## G.    The Five Orders on Review

### 1.    Appeal No. 13-60140

The first three orders on review arise from the Arkansas Commission's complaint requesting that FERC modify the System Agreement.

#### a.    Arkansas Complaint Order

In 2009, the Arkansas Commission sought to remove language in the depreciation-rate calculations for nuclear generating units in the bandwidth formula. The challenged language, which we discuss below and refer to throughout as the "unless clauses," indicated that FERC had jurisdiction over these depreciation rates. *See infra* Part A.1.a. FERC denied the complaint because the Arkansas Commission had not met its burden under Section 206. *Arkansas Publ. Serv. Comm'n v. Entergy Corp.*, 128 FERC ¶ 61,020 at P 23 (2009) ("*Arkansas Complaint Order*"). FERC found that the Arkansas Commission's arguments were "beyond the scope of its Complaint" and better directed at the decision in the first bandwidth proceeding. *Id.* at P 24. FERC also found the contractual language "consistent with FERC's authority under the FPA" because "[i]n order for the bandwidth calculation to provide a just and reasonable result under the FPA, the Commission must ensure that the inputs used to calculate the bandwidth are also just and reasonable." *Id.* at P 25.

#### b.    First Arkansas Rehearing Order

FERC subsequently denied rehearing, finding it unnecessary to revise the language because FERC had clarified its treatment of depreciation

No. 13-60140 c/w No. 13-60141

expenses in a number of other orders. *Arkansas Publ. Serv. Comm'n v. Entergy Corp.*, 137 FERC ¶ 61,030 at P 19 (2011) ("*First Arkansas Rehearing Order*"). FERC further clarified:

> [*The Arkansas Complaint Order*] was not intended to suggest that the justness and reasonableness of the various inputs to the bandwidth formula was [sic] open to challenge in the bandwidth proceedings. Instead, that language was intended to mean that each input in the bandwidth formula should be examined to make sure that the correct data was used in determining the bandwidth payments.

*Id.* at P 23.

### c.    Second Arkansas Rehearing Order

The Louisiana Commission next sought rehearing of the *First Arkansas Rehearing Order*. FERC subsequently denied rehearing, but clarified how the Louisiana Commission could challenge inputs to the bandwidth formula. *Arkansas Publ. Serv. Comm'n v. Entergy Corp.*, 142 FERC ¶ 61,012 at PP 25–42 (2012) ("*Second Arkansas Rehearing Order*").

### 2.    Appeal No. 13-60141

The remaining two orders on review relate to the second bandwidth proceeding.

### a.    Opinion No. 514

In *Opinion No. 514* FERC reviewed the Arkansas Commission's challenge to depreciation inputs and the Louisiana Commission's challenge to Entergy Corporation's adjustment of Entergy Louisiana's capital structure to account for the Vidalia transaction. FERC reversed the administrative law judge's determination on the depreciation inputs but affirmed the administrative law judge's decision regarding the Vidalia transaction. *Opinion No. 514,* 137 FERC ¶ 61,029 at PP 72–78.

No. 13-60140 c/w No. 13-60141

### b.    Opinion No. 514-A

FERC subsequently denied rehearing on both issues. *Opinion No. 514-A,* 142 FERC ¶ 61,013 at P 1.

## DISCUSSION

The Louisiana Commission petitions for review of FERC's interpretation of the System Agreement's depreciation formula and Entergy Corporation's treatment of the Vidalia transaction.

## A.    The Depreciation Issue

The Louisiana Commission's grievance with FERC's interpretation of depreciation expenses in the System Agreement arises from contractual language in the System Agreement, FERC's initial interpretation of this language, and FERC's subsequent correction of its interpretation. Ultimately, we find that FERC's corrective interpretation is reasonable, not arbitrary, and not otherwise discordant with law.

### 1.    Depreciation under the System Agreement

As discussed, the bandwidth formula is a formula rate incorporated into the System Agreement. The relevant sections instruct Entergy Corporation on the cost variables that populate the formula. The language in these sections, the "unless clauses," is ambiguous as to when and how a party may challenge the justness and reasonableness of a particular depreciation value.

### a.    The "Unless Clauses"

The System Agreement defines certain cost variables as incorporating actual values recorded in certain FERC accounts as approved by retail regulators. These definitions, however, contain an important proviso. For example, "NAD," or "Nuclear Accumulated Provision for Depreciation and Amortization" is defined as "excluding ARO associated with NPP above, as recorded in FERC Accounts 108 and 111 (consistent with the accounting standards relating to Statement of Financial Accounting Standards (SFAS)

143 approved by the retail regulator having jurisdiction over the Company, *unless the FERC determines otherwise*).” (emphasis added). The other variables at issue in this petition contain similar “unless clauses.”[5]

### b.　FERC's Initial Interpretation

In the early stages of implementing the bandwidth formula, it was unclear when and how a party could challenge whether a particular input was just and reasonable. Initially, FERC held that parties could challenge formula inputs in the bandwidth proceedings. In 2008, FERC dismissed the Louisiana Commission's Section 206 complaint regarding “the justness and reasonableness of cost inputs” because these issues were presented in the bandwidth proceeding and “there [was] no need to establish a separate proceeding to address them.” *La. Pub. Serv. Comm'n*, 124 FERC ¶ 61,010 at P 27.

Consistent with its position that the bandwidth proceedings were the proper venue to challenge inputs, FERC rejected the Arkansas Commission's complaint to remove the “unless clauses” from the System Agreement.

---

[5] The System Agreement defines the variable “ADXN” as: “Accumulated Provision for Depreciation and Amortization associated with PPXN and CME above, as recorded in FERC Accounts 108 and 111, excluding ARO associated with PPXN and CME, if any, (consistent with the accounting relating to SFAS 143 approved by the retail regulator having jurisdiction over the Company, *unless the FERC determines otherwise*)” (emphasis added). “GAD,” or the “General Plant Accumulated Provision for Depreciation,” also is accompanied by the operative caveat: “(consistent with the accounting relating to SFAS 143 approved by the retail regulator having jurisdiction over the Company, *unless the FERC determines otherwise*)” (emphasis added). Depreciation expenses for nuclear plants and non-nuclear plants contain a slightly different formulation, but a similar theme. “NDE” is the “Nuclear Depreciation and Amortization Expense associated with (NPP) as recorded in Accounts 403 and 404 and Decommissioning Expense, as approved by Retail Regulators, *unless the jurisdiction for determining the depreciation and/or decommissioning rate is vested in the FERC under otherwise applicable law*” (emphasis added). “DEXN,” in turn, is “Depreciation and Amortization Expense associated with the plant investment in PPXN as recorded in FERC Accounts 403 and 404, as approved by Retail Regulators *unless the jurisdiction for determining the depreciation rate is vested in the FERC under otherwise applicable law*” (emphasis added).

No. 13-60140 c/w No. 13-60141

*Arkansas Complaint Order*, 128 FERC ¶ 61,020 at P 25. FERC explained, "the authority to determine the payments under the bandwidth necessarily must include the ability to examine the inputs used to calculate the bandwidth." *Id.*

### c.    FERC Changes Course

Notwithstanding its initial interpretation, FERC, in a variety of orders, changed course and explained that bandwidth proceedings were not the proper venue to challenge the formula. In the first bandwidth proceeding, FERC again interpreted the System Agreement, this time explaining:

> [A]lthough the . . . two provisions state that the Commission has the authority to change the depreciation and decommissioning expenses included in the bandwidth formula, *we will not do so in a proceeding established to determine the actual production costs of the Operating Companies for 2006. Any changes to the bandwidth formula require a section 205 or 206 filing.*

*Opinion No. 505*, 130 FERC 61,023 at P 172 (emphasis added). FERC further explained: "There is no question that the Commission has the authority to determine depreciation and decommissioning expenses for purposes of setting a wholesale rate. However, that is not what is before us in this proceeding." *Id.* at P 173.

In the *Third Bandwidth Interlocutory Order*, FERC clarified its previous orders embracing the contrary interpretation:

> We acknowledge, however, that prior to Entergy's annual bandwidth filings, when neither we nor the parties had any experience with such filings, the Commission did make some general statements that could be interpreted as suggesting that parties had the opportunity in Entergy's annual bandwidth filings to challenge the reasonableness of any cost inputs in the Service Schedule MSS-3 bandwidth formula, including the depreciation rates effective for Entergy's annual bandwidth filings. Such statements, however, were made prior to final Commission action on the first annual bandwidth filing and thus did not benefit from experience in addressing these annual bandwidth filings.

12

Consequently, the language in the Arkansas Commission Complaint Order, in hindsight, was not as precise as it could have been and may have been unintentionally misleading.

130 FERC 61,170 at P 20.

In the second bandwidth proceeding, FERC reiterated its position on proper challenges to the formula: "The Commission has made clear that changes to the bandwidth formula must be done through either a section 205 or 206 proceeding." *Opinion No. 514*, 137 FERC 61,029 at P 48. "[W]e interpret the 'unless' clause, while ambiguous," FERC continued,

> as establishing that some of the actual depreciation expenses recorded and reflected in the bandwidth formula may include depreciation expenses charged to traditional wholesale customers that were approved by the Commission and not the retail regulators, rather than as an acknowledgement of the possibility that in a filing implementing the bandwidth remedy the Commission will require Entergy to input depreciation expenses other than the expenses already approved for inclusion in the bandwidth formula as approved by retail regulators and recorded in FERC Accounts 403 and 404.

*Id.* at P 54.

In the *First Arkansas Rehearing Order*, FERC corrected the interpretation it had put forth in the *Arkansas Complaint Order*:

> Consistent with our interpretation of the treatment of depreciation expenses in the annual bandwidth proceedings in the three orders discussed above, we clarify that the cited language from the July 14 Order was not intended to suggest that the justness and reasonableness of the various inputs to the bandwidth formula was [sic] open to challenge in the bandwidth proceedings.

137 FERC ¶ 61,030 at P 23.

## 2.    Jurisdiction

Before discussing the merits of the Louisiana Commission's petition, we address the Arkansas Commission's motion to dismiss the Louisiana Commission's petition in No. 13-60140 for lack of jurisdiction. Appeal No. 13-

No. 13-60140 c/w No. 13-60141

60140 relates to the three orders arising from the Arkansas Commission's complaint proceeding. Under the FPA, only a party "aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order." 16 U.S.C. § 825*l*(b). Moreover, to gain review, a party must seek rehearing of the relevant orders. *See* 16 U.S.C. § 825*l*(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."). The Arkansas Commission argues that the Arkansas complaint orders granted the Louisiana Commission the relief it sought; specifically, the orders denied the Arkansas Commission's complaint to adjust the tariff language. *Second Arkansas Rehearing Order*, 142 FERC ¶ 61,012 at P 24 ("Rehearing of an order on rehearing lies only when the order on rehearing modifies the result reached in the original order in a manner that gives rise to a wholly new objection. Here, we find that is not the case.").

To be sure, as to the *Arkansas Complaint Order*, the Louisiana Commission did not seek rehearing because the complaint was dismissed and FERC interpreted the System Agreement to allow for consideration of inputs at the bandwidth proceedings. On a rehearing request by the Arkansas Commission, however, FERC clarified that its prior statements about the viability of cost challenges in bandwidth proceedings were "not intended to suggest that the justness and reasonableness of the various inputs to the bandwidth formula was [sic] open to challenge in the bandwidth proceedings." *First Arkansas Rehearing Order*, 137 FERC ¶ 61,030 at P 23. It is this clarification that allegedly aggrieves the Louisiana Commission. Accordingly, the Louisiana Commission sought rehearing of this order. *See Second Arkansas Rehearing Order*, 142 FERC ¶ 61,012 at PP 25–26. In the *Second Arkansas Rehearing Order*, FERC explained: "[T]he October 7 Rehearing

14

Order does not modify the results of the Order Denying Complaint; it supplies an *improved rationale.*" *Id.* at P 25 (internal quotation marks omitted). The *First Arkansas Rehearing Order* did not reverse a previous FERC order, it explained, but rather "clarified the proper procedural manner in which to raise objections concerning bandwidth formula inputs, on the one hand, and changes to the methodology of Service Schedule MSS-3, on the other." *Id.* FERC did further "clarify" that certain challenges are amenable to the bandwidth proceedings, but that "consistent with any change to a filed rate, the effect of any changes to such terms contained within the bandwidth formula, including the manner in which data is sourced, will be prospective only." *Id.* at PP 41.

FERC takes no position on the Arkansas Commission's motion to dismiss for lack of jurisdiction. As FERC states, "[a]s a practical matter . . . [in the *Arkansas Rehearing Orders*] FERC explained, at some length, its treatment of retail depreciation rates for purposes of the bandwidth formula, and the appropriate avenues for challenging inputs and calculations under the bandwidth formula—issues that also are raised on review in 5th Cir. No. 13-60141." Nonetheless, the *Arkansas Rehearing Orders* did "clarify" a rule that aggrieves the Louisiana Commission by identifying the proper forum for cost challenges and further suggesting that relief would be prospective only. This order "cannot be fairly characterized as being in [the Louisiana Commission's] favor." *Oxy USA, Inc. v. FERC*, 64 F.3d 679, 689 (D.C. Cir. 1995) ("By advocating a specific settlement, petitioners did not forfeit their standing to object to elements of the settlement to which they had agreed if changes made in others by the Commission work to their overall disadvantage.").

FERC therefore injected an adverse rule into the Arkansas Complaint proceeding in the *First Arkansas Rehearing Order* and it is reviewable here. *See, e.g., S. Natural Gas Co. v. FERC*, 877 F.2d 1066, 1073 (D.C. Cir. 1989) ("Otherwise, we would permit an endless cycle of applications for rehearing

and denials, limited only by FERC's ability to think up new rationales—which, since none of them would be put to a test in court, would not be much of a limitation." (internal quotation marks omitted)); *Sam Rayburn Dam Elec. Co-op v. Federal Power Comm'n*, 515 F.2d 998, 1007 (D.C. Cir. 1975) ("Endorsement of the position that the FPC takes would permit an administrative agency to enter an ambiguous or obscure order, wilfully or otherwise, wait out the required time, then enter an 'explanatory' order that would extinguish the review rights of parties prejudicially affected."). Although granting the motion would present no bar to our reaching the same depreciation issues raised in *Opinion Nos. 514* and *514-A*, we deny the Arkansas Commission's motion to dismiss for lack of jurisdiction in Appeal No. 13-60140.

### 3.    The Louisiana Commission's Petition for Review

The System Agreement incorporates state regulatory agencies' depreciation rates into the bandwidth formula. Thus, FERC has interpreted challenges to the state depreciation rates as attacks on the formula itself. Annual bandwidth proceedings, by contrast, are reserved for challenges to whether Entergy Corporation has properly implemented the formula rate. Accordingly, FERC found that the Louisiana Commission's grievances with the state depreciation rates are challenges to the formula itself and may not be addressed in an annual bandwidth proceeding.

The Louisiana Commission makes three distinct challenges to FERC's interpretation of the System Agreement. We review Commission orders under the standards set forth in the Administrative Procedure Act. 5 U.S.C. § 706(2)(A); *Council of City of New Orleans, La. v. FERC*, 692 F.3d 172, 176 (D.C. Cir. 2012); *PSEG Energy Resources & Trade LLC v. FERC*, 665 F.3d 203, 207–08 (D.C. Cir. 2011) ("Under § 313(b) of the FPA, 16 U.S.C. § 825*l*(b), we have jurisdiction to review FERC's orders, which we assess to determine

whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A))).

### a.   FERC's interpretation does not constitute an unlawful subdelegation or conflict with the FPA.

First, the Louisiana Commission contends that FERC's interpretation of the System Agreement violates the FPA because it impermissibly subdelegates to state regulatory agencies its exclusive authority to regulate all aspects of bandwidth calculation. FERC does not claim statutory authority to subdelegate to state agencies, but rather responds that it has not in fact subdelegated its authority and that its interpretation is consistent with the FPA. The parties dispute the extent to which we should defer to FERC on this question, but the D.C. Circuit has rejected FERC's claim for deference in a similar challenge. *United States Telecom Ass'n v. FCC*, 359 F.3d 554, 567 (D.C. Cir. 2004) ("The Commission's plea for *Chevron* deference is unavailing. A general delegation of decision-making authority to a federal administrative agency does *not*, in the ordinary course of things, include the power to subdelegate that authority beyond federal subordinates."). Accordingly, and because the result would be the same even under the standard of review most favorable to the Louisiana Commission, we review this challenge *de novo*.

The System Agreement provides the formula for each operating company's "Actual Production Costs." Depreciation expense is one component of actual production costs, *Opinion No. 514*, 137 FERC ¶ 61,029 at P 11, and that depreciation expense shall be based on "*actual amounts on the Company's books* for the twelve months ended December 31 of the previous year *as reported in FERC Form 1* . . . and shall include certain retail regulatory adjustments pursuant to the production cost methodology set forth in Exhibit ETR-26/ETR-28" (emphasis added). FERC interprets this to "require[] that depreciation expense, as well as all other expense items, be based on the actual

17

amounts on the Company's books for the twelve months ended December 31 of the previous year as reported in FERC Form 1." *Opinion No. 514,* 137 FERC ¶ 61,029 at P 47. Actual depreciation expenses reported on a company's Form 1 include state-regulator approved depreciation expenses: "The formula mandates the use of depreciation rates reported in the FERC Form 1, reflecting, in part, state regulator approved depreciation rates, which the Commission has adopted for use in the bandwidth formula." *Id.* at P 49. The Louisiana Commission challenges this interpretation as an unlawful subdelegation of FERC's ratemaking authority to state agencies because FERC is interpreting the System Agreement to "preclude[] it from adjusting retail-approved depreciation expenses."

We have explained that "[a]n agency abdicates its role as a rational decision-maker," and impermissibly subdelegates, "if it does not exercise its own judgment, and instead cedes near-total deference to private parties' estimates—even if the parties agree unanimously as to the estimated amount." *Tex. Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 328 (5th Cir. 2001). We conclude that there is no unlawful subdelegation in this case because FERC exercised its role when it initially reviewed and accepted the bandwidth formula incorporating the state agencies' depreciation rates: "Such specification and incorporation of retail regulator-approved depreciation rates has been reviewed and accepted by the Commission as a just and reasonable element of the bandwidth formula methodology." *Opinion No. 514-A*, 142 FERC ¶ 61,013, at P 17 (citing *2006 Compliance Order*). Moreover, FERC has clarified that it will continue to exercise oversight of the state rates in a Section 206 complaint proceeding: "If any entity wants to change the depreciation rates used in that formula, it must seek a modification to the bandwidth formula in a section 205 or 206 filing. It cannot do so in this proceeding, which is simply

to implement the bandwidth formula for 2007." *Opinion No. 514*, 137 FERC 61,029 at P 52.

Therefore, and contrary to the Louisiana Commission's argument that FERC interpreted the System Agreement to "preclude" itself from reviewing the reasonableness of depreciation inputs, FERC reviewed the reasonableness of incorporating the state agencies' rates when it accepted the bandwidth formula and continues to review them in Section 206 complaint filings. *See, e.g.*, *Pub. Utils. Comm'n of the State of Cal. v. FERC*, 254 F.3d 250, 257 (D.C. Cir. 2001) ("In approving formula rates, the Commission has relied on § 206 as a mechanism to ensure that the rates are just and reasonable, and its reliance on § 206 has survived judicial scrutiny." (internal citations omitted)).

Further, the Louisiana Commission has prosecuted a Section 206 complaint challenging the very inputs it contends FERC has shielded from review. In *Opinion No. 519*, FERC rejected the Louisiana Commission's complaint because it did not "me[e]t its burden of proof under section 206 of the Federal Power Act . . . to show the existing bandwidth formula is unjust and unreasonable or unduly discriminatory or preferential." *Opinion No. 519*, 139 FERC ¶ 61,107 at P 2. Importantly, the Louisiana Commission did not "demonstrate[] that the inclusion of retail depreciation data in the depreciation and decommissioning components of the bandwidth formula is unjust and unreasonable or unduly discriminatory or preferential." *Id.* at P 108; *see also id.* at P 121 ("We affirm the Presiding Judge's holding that no evidence suggests the formula (or inputs) is unjust, unreasonable or unduly discriminatory or preferential."). FERC's continuing review in Section 206 proceedings distinguishes it from the unease expressed in *United States Telecom*, of agencies' "vague or inadequate assertions of final reviewing

authority." 359 F.3d at 568.[6] The Louisiana Commission concedes that "FERC did make that decision," but does not explain how it nonetheless can press its argument that FERC subdelegated its authority. Accordingly, FERC has not unlawfully subdelegated to state regulators and continues to exercise its authority consistent with the FPA.

### b.　　FERC's interpretation is not arbitrary or unreasonable.

Second, and apart from its subdelegation argument, the Louisiana Commission challenges FERC's interpretation of the unless clauses as arbitrary and incorrect: "FERC's interpretation defeats the purpose of the tariff and fails to consistently read its language." Courts defer especially to FERC's ratemaking orders. *See, e.g.*, *ExxonMobil Corp. v. FERC*, 487 F.3d 945, 951 (D.C. Cir. 2007) ("In reviewing FERC's orders, we are particularly deferential to the Commission's expertise with respect to ratemaking issues." (internal quotation marks omitted)); *Pub. Utils. Com'n of State of Cal. v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001) ("Because [i]ssues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission, our review of whether a particular rate design is 'just and reasonable' is highly deferential." (internal quotation marks omitted)). To this end, the D.C. Circuit gives "substantial deference to [FERC's] interpretation of filed tariffs, even where the issue simply involves the proper construction of language." *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814 (D.C. Cir. 1998) (internal quotation marks omitted). This deference to FERC on matters of its technical expertise in the ratemaking process is "simply an acknowledgment that the principles set forth by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837

---

[6] Rehearing on *Opinion No. 519* is pending and therefore FERC's order is not before this Court on review.

(1984), extend to all areas in which an agency has been delegated power by Congress to act." *Koch*, 136 F.3d at 814. The D.C. Circuit has termed its review "'*Chevron*-like' in nature." *Old Dominion Elec. Co-op. Inc. v. FERC*, 518 F.3d 43, 48 (D.C. Cir. 2008).

In the D.C. Circuit, review of FERC's interpretation of the System Agreement proceeds in the familiar two steps: "We first look to see if the language of the tariff is unambiguous—that is, if it reflects the clear intent of the parties to the agreement. If the tariff language is ambiguous, we defer to the Commission's construction of the provision at issue so long as that construction is reasonable." *Koch*, 136 F.3d at 814–15; *see also Idaho Power Co. v. FERC*, 312 F.3d 454, 461 (D.C. Cir. 2002) ("If the tariff's language is unambiguous, this court need not defer to FERC's interpretation. After all, a court need not accept an agency interpretation that black means white. However, if the choice lies between dark grey and light grey, the conclusion of the agency . . . will have great weight." (internal quotation marks omitted)).

Our circuit has recognized, however, that "[a]lthough there may be room to defer to the views of the agency where the understanding of the problem is enhanced by the agency's expert understanding of the industry, agency interpretation on such questions is not conclusive." *Mid La. Gas Co. v. FERC*, 780 F.2d 1238, 1243 (5th Cir. 1986); *see also Tenn. Gas Pipeline Co. v. FERC*, 17 F.3d 98, 102 (5th Cir. 1994) ("This Court will not defer to FERC's construction of such contracts unless FERC relied on its factual or technical expertise in reaching its conclusions."); *El Paso Natural Gas Co. v. FERC*, 881 F.2d 161, 164 (5th Cir. 1989). In this case, the Louisiana Commission does not contest that FERC applied its technical and factual expertise in interpreting the System Agreement and noted that "[i]f expertise is required, the interpretation must still be reasonable."

Nevertheless, at oral argument and in a subsequent Rule 28(j) letter, the Louisiana Commission urged that no deference is owed to FERC because "[i]t is . . . well understood that no deference is due if FERC's interpretation is inconsistent with prior agency interpretations." *Idaho Power*, 312 F.3d at 461. "Arguments presented for the first time at oral argument are waived." *Comsat Corp. v. FCC*, 250 F.3d 931, 936 n.5 (5th Cir. 2001). In any event, *Idaho Power* considered a Commission interpretation "inconsistent with prior and subsequent agency interpretations" that FERC had "consistently adopted." *Id.* By contrast, FERC here abandoned its initial interpretation of the System Agreement in a variety of orders uniformly clarifying that it did not mean to indicate that the bandwidth proceedings were the appropriate forum for the Louisiana Commission's challenges. To this end, the Supreme Court has explained that "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework." *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005). "For if the agency adequately explains the reasons for a reversal of policy, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Id.* (internal citations omitted); *see also Chevron*, 467 U.S. at 863–64 ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis."); *Verizon v. FCC*, 740 F.3d 623, 636 (D.C. Cir. 2014) ("But so long as an agency adequately explains the reasons for a reversal of policy, its new interpretation of a statute cannot be rejected simply because it is new." (internal quotation marks omitted)). Because FERC utilized its technical and factual expertise to interpret the ambiguous language, we reject the Louisiana Commission's belated request to withhold deference. We note however, that even if FERC did

not rely on any technical or factual expertise, and we were reviewing its interpretation "freely," the System Agreement's language sustains FERC's interpretation. *Mid. La. Gas Co.*, 780 F.2d at 1243.

The Louisiana Commission interprets the unless clauses as requiring FERC to test each cost variable for justness and reasonableness in each annual bandwidth proceeding and providing FERC authority to substitute different depreciation-expense amounts from those on the FERC Form 1. FERC's competing interpretation gives meaning to the first half of the definition, which explains "where Entergy is to get the information to populate the variable." *Opinion No. 514*, 137 FERC 61,029 at P 54. The second half, by using "unless," explains that a company sometimes may use depreciation expenses charged to wholesale customers approved by FERC rather than by state agencies.

> Thus, we interpret the "unless" clause, while ambiguous, as establishing that some of the actual depreciation expenses recorded and reflected in the bandwidth formula may include depreciation expenses charged to traditional wholesale customers that were approved by the Commission and not the retail regulators, rather than as an acknowledgement of the possibility that in a filing implementing the bandwidth remedy the Commission will require Entergy to input depreciation expenses other than the expenses already approved for inclusion in the bandwidth formula as approved by retail regulators and recorded in FERC Accounts 403 and 404.

*Id.*

We find, and the Louisiana Commission does not dispute, that the unless clauses are ambiguous, as they are "not detailed enough to resolve the particular question before the court," namely, whether FERC is mandated to restructure depreciation inputs at each annual bandwidth proceeding or whether the unless clauses instead refer only to those instances when state agencies do not provide the relevant data. Moreover, FERC's interpretation is reasonable because it gives meaning to both clauses in the variable definitions.

*See Koch*, 136 F.3d at 814. The Louisiana Commission's interpretation of the unless clauses, by contrast, subsumes the primary clause, which provides that the amounts recorded reflect the actual depreciation expenses. *Opinion No. 514*, 137 FERC 61,029 at P 54 ("[I]f the 'unless' clause was intended to refer to FERC's exclusive jurisdiction over the bandwidth formula, that clause would always apply and the remaining language of the definition would be rendered meaningless."). The System Agreement reflects a decision to incorporate actual costs reflected on FERC Form 1 into the formula. Unlike FERC's interpretation, the Louisiana Commission's interpretation undercuts that remedial scheme in favor of a yearly reconstruction of each company's costs in the bandwidth proceedings.

FERC's interpretation is also consistent with the filed-rate doctrine. Under the filed-rate doctrine, "[w]hen the Commission accepts a formula rate as a filed rate, it grants waiver of the filing and notice requirements of [§ 205] [, and] [t]he utility's rates, then, can change repeatedly, without notice to the Commission, *provided* those changes are consistent with the formula." *Pub. Utils. Com'n of State of Cal. v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001) (alterations in the original). "[T]he formula itself is the filed rate that provides sufficient notice to ratepayers for purposes of the doctrine," and if FERC were to supplant retail regulators' actual depreciation rates with its own reconstructed rates, FERC would change the formula set forth in Section 30.12. *Id.* at n.3. An attack on the formula itself is not valid in an annual bandwidth proceeding; instead, FERC has explained the scope of bandwidth-proceeding challenges:

> [P]arties in a bandwidth implementation proceeding may challenge: (1) whether the inputs were calculated consistent with the formula and the applicable accounting rules; (2) conformance with retail regulatory approvals to the extent the formula requires use of values approved by retail regulators; and, (3) in instances

where there are details omitted from the accepted Service Schedule MSS-3 formula, with the underlying details included in the methodology used in Exhibits ETR-26 and ETR-28.21 Further, . . . the Louisiana Commission and other parties may challenge the prudence of cost inputs to the bandwidth formula in this bandwidth proceeding.

*Fourth Bandwidth Rehearing Order*, 137 FERC ¶ 61,019 at P 13.[7] Accordingly, we uphold FERC's interpretation of the System Agreement.

### c. FERC's change of interpretation was not arbitrary.

Third, the Louisiana Commission argues that FERC's "reversal of field without a persuasive explanation is arbitrary." This challenge is reviewed under the arbitrary and capricious standard, which "does not authorize a reviewing court to substitute its judgment for that of the agency." *Brazos Elec. Power Co-op., Inc. v. FERC*, 205 F.3d 235, 240 (5th Cir. 2000). We inquire "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *id.* (internal quotation marks omitted), lending high deference to the agency. *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).

FERC changed its interpretation in light of its gained experience conducting annual bandwidth proceedings, explained its new interpretation of the System Agreement, and consistently has interpreted the System Agreement after the change: "[T]hese statements were made prior to final Commission action on the first annual bandwidth filing and thus did not benefit from experience in addressing these annual bandwidth filings." *Opinion No. 514*, 137 FERC ¶ 61,029 at P 48 (internal quotation marks

---

[7] An annual bandwidth proceeding is ill suited to an inquiry into the specific depreciation rates. Record testimony indicated that performing a depreciation study on an annual basis would be "not only impractical" but "a waste of resources" because "[d]oing such studies annually presumes that conditions change significantly on an annual basis to warrant a new study."

omitted). "Here, [FERC] offered a reasoned explanation for its approach; no more is required." *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1245 (D.C. Cir. 2014).

The Louisiana Commission insists that FERC's interpretation precludes it from gaining retroactive relief for past inequities, but the absence of retroactive relief is a function of the filed-rate doctrine. The Louisiana Commission's proposed changes are to the bandwidth formula itself—substituting new depreciation rates for the state regulatory rates incorporated into the formula. Under the filed-rate doctrine, "[n]ot only do the courts lack authority to impose a different rate than the one approved by the Commission, but the Commission itself has no power to alter a rate retroactively. . . . This rule bars the Commission's retroactive substitution of an unreasonably high or low rate with a just and reasonable rate." *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 578 (1981) (internal citations and quotation marks omitted).

Further, any prejudice to the Louisiana Commission is mitigated by *Opinion No. 519*, in which FERC resolved the Louisiana Commission's arguments on the merits and found that the Louisiana Commission had not met its burden. *Opinion No. 519*, 139 FERC ¶ 61,107 at P 122. The Louisiana Commission's argument that the denial of retroactive relief in a future Section 206 proceeding is a retroactive application of a prejudicial procedural-rule change is thus premature; the Louisiana Commission has not yet met its Section 206 burden for *prospective* relief let alone retroactive relief. As FERC acknowledged at oral argument, if the Louisiana Commission eventually proves successful and FERC denies retroactive relief, then the Louisiana Commission may better advance this argument, which relies on *Pac. Molasses Co. v. FTC*, 356 F.2d 386, 390 (5th Cir. 1966), and is raised in its Rule 28(j) letter.

Accordingly, the Louisiana Commission's change in interpretation was reasoned and not arbitrary. We therefore deny the petitions for review as to the depreciation issues.

## B.    The Vidalia Issue

The Louisiana Commission next challenges Entergy Corporation's "reversal" of the Vidalia transaction under the language in the System Agreement as an impermissible change to the formula rate without proper notice. Deciding that the Louisiana Commission's petition attacks a prior order not before us here, we dismiss the petition as an impermissible collateral attack. *See Sacramento Mun. Util. Dist. v. FERC*, 428 F.3d 294, 299 (D.C. Cir. 2005) ("Because the time for seeking judicial review has long passed, Sacramento's argument amounts to an impermissible collateral attack on the previously approved California ISO tariff."); *City of Nephi, Utah v. FERC*, 147 F.3d 929, 934 (D.C. Cir. 1998) ("Challenges to this decision were appropriate during the Order No. 636 proceedings but fall outside of the court's jurisdiction here.").

### 1.    Background

In *Opinion No. 480*, FERC "conclude[d] that Vidalia was not planned as a resource for the benefit of Entergy's system." *Opinion No. 480*, 111 FERC ¶ 61,311 at P 182. Because Vidalia did not benefit the Entergy System as a whole, FERC determined that Vidalia's "costs should not now be spread throughout Entergy's system." *Id.* at P 174. The D.C. Circuit affirmed FERC's treatment of the Vidalia transaction: "In view of these considerations, and based on the record, FERC reasonably concluded that it would be inappropriate [t]o allow Louisiana to shift the escalating costs of the Vidalia contract to other states on the Entergy System and not accept responsibility for its own decision making." *La. 2008*, 522 F.3d at 396 (internal quotation marks omitted) (alteration in original).

Entergy Corporation subsequently submitted changes to the System Agreement to comply with *Opinion Nos. 480* and *480-A*. In its 2006 compliance filing, Entergy Corporation modified the System Agreement by, among other things, including a footnote explaining that:

> All Rate Base, Revenue and Expense items . . . shall include certain retail regulatory adjustments pursuant to the production cost methodology set forth in Exhibit [Nos.] ETR-26/ETR-28 filed in Docket No. EL01-88-001, including but not limited to: . . . (3) re-pricing of energy associated with the Vidalia purchase power contract for [Entergy Louisiana] based on the average annual Service Schedule MSS-3 rate paid by [Entergy Louisiana,] including the exclusion of the income tax savings of the Vidalia purchase power contract from ADIT and r*eflecting the reversal of the Vidalia capital transaction*, and the debt rate associated with the Waterford 3 Sale/Leaseback for [Entergy Louisiana].

(emphasis added). Entergy Corporation accompanied its 2006 filing with a transmittal letter explaining its adjustments to the System Agreement. Among the noticed changes, the letter explained that the Vidalia transaction would be adjusted: "Related adjustments to exclude income tax savings associated with the Vidalia purchase power contract, and to reflect the reversal of the capital cost transaction regarding Vidalia on behalf of ELL also will be made, consistent with Exhibits ETR-26 and ETR-28."

FERC twice accepted Entergy Corporation's compliance filings without any objection by the Louisiana Commission as to the language indicating a "reversal" of the Vidalia transaction. *See 2006 Compliance Order*; *2007 Compliance Order*. In the second bandwidth proceeding, however, Entergy Corporation "added $289,502,500 to the long-term debt component of the capital structure, and $240,000,000 to the common equity component of the capital structure." The Louisiana Commission objected to this reversal of Entergy Louisiana's capital structure and now petitions for review of *Opinion Nos. 514* and *514-A.*

**2.     The Louisiana Commission's Petition for Review**

The Louisiana Commission does not argue that FERC misinterpreted the System Agreement to allow Entergy Corporation to "reverse" the Vidalia transaction[8]; instead, the Louisiana Commission urges that FERC's approval of Entergy Corporation's adjustment "violates the public notice requirements of the Federal Power Act and reflects arbitrary decisionmaking." The FPA provides that, "[u]nless the Commission otherwise orders, no change shall be made by any public utility in any such rate . . . except after sixty days' notice to the Commission and to the public." 16 U.S.C. § 824d(d). The Louisiana Commission contends that by allowing Entergy Corporation to reverse the capital ratios of the Vidalia transaction FERC modified the rate and therefore was required to give proper notice and hold a Section 205 proceeding.

We review FERC's orders under the arbitrary and capricious standard. 5 U.S.C. § 706(2)(A). "In reviewing an agency's decision under the arbitrary and capricious standard, there is a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous." *Tex. Clinical Labs*, 612 F.3d at 775.

**3.     Discussion**

The Louisiana Commission's alleged harm arises from Entergy Corporation's 2006 and 2007 compliance filings and not from the orders before us. *See Opinion No 514-A,* 142 FERC ¶ 61,013 at P 34 ("The Louisiana Commission argues further that Entergy's filing failed to properly notice the changes in methodology in the compliance filing, *which renders the filing void.*" (emphasis added)). To rule in favor of the Louisiana Commission we would have to unravel FERC's *2006* and *2007 Compliance Orders* that approved the

---

[8] The Arkansas Commission highlights that the Louisiana Commission has not filed a Section 206 proceeding to alter this language.

tariff language sanctioning the reversal of the Vidalia transaction. Accordingly, the Louisiana Commission's petition is an impermissible collateral attack on orders not before the Court. *See Opinion No. 514-A*, 142 FERC ¶ 61,013 at P 38 (noting that the Louisiana Commission's position "is an impermissible collateral attack on the Commission's orders approving Entergy's proposed amendments to Service Schedule MSS-3.").

### a. The Louisiana Commission was aware of the contested language in 2006, but did not object.

Entergy Corporation's compliance filing included a red-line revision of the System Agreement, which contained the addition of footnote 1, but the Louisiana Commission did not object to the Vidalia-transaction language. *Opinion No. 514*, 137 FERC 61,029 at P 59. Although "[t]he Louisiana Commission protested certain parts of the April 2006 Compliance Filing," it "did not protest language regarding Vidalia in footnote 1." *Opinion No. 514*, 137 FERC ¶ 61,029, at P 72. Entergy Corporation again proposed changes to the bandwidth formula in its second compliance filing and maintained the language authorizing the reversal of the Vidalia capital transaction, but the Louisiana Commission did not object. Accordingly, "[t]he Commission had not one, but two opportunities to reject the adjustment as a material change that required a separate section 205 filing." *Id.*

Tellingly, the Louisiana Commission objected to other aspects of Entergy Corporation's compliance filings in 2006 and 2007. *See, e.g.*, *2006 Compliance Order*, 117 FERC 61,203, at PP 65–69 (noting that "[t]he Louisiana Commission raises several other issues: (1) Entergy has failed to specifically identify the accumulated deferred income taxes associated with the nuclear generating facilities; (2) the description of the adjustment to reflect the River Bend Deregulated Asset Plan is incorrect; and (3) Entergy needs to provide more specificity with respect to the retail treatment of ELL's Sale/Leaseback

of Waterford 3."); *2007 Compliance Order*, 119 FERC ¶ 61,095, at P 51 ("The only protest of Entergy's compliance filing comes in the form of a one-paragraph protest by the Louisiana Commission that seeks to reserve and raise on rehearing all issues that the Louisiana Commission raised in its challenges to Opinion Nos. 480 and 480-A."); *La. 2009*, 341 F. App'x at 650–51 (noting the Louisiana Commission's three challenges to the compliance filing). Importantly, and demonstrating that the Louisiana Commission was put on notice by footnote 1, the Louisiana Commission objected to the repricing of Vidalia. *See La. 2009*, 341 F. App'x at 650 ("LPSC next argues that FERC should have rejected the compliance filing's pricing method for the Vidalia hydroelectric plant."). These compliance proceedings provided the proper forum for the Louisiana Commission's objections to the System Agreement language.

Indeed, in the *2006 Compliance Order*, FERC rejected Entergy Corporation's "request to make adjustments to the methodology reflected in Exhibits ETR-26 and ETR-28" because "Entergy must comply with the requirements of Opinion Nos. 480 and 480-A" in the compliance filings and submit a Section 205 filing if it wishes to change the formula. *2006 Compliance Order*, 117 FERC ¶ 61,203 at P 69. Entergy Corporation's proposed changes were deemed "non-compliant adjustments to the methodology reflected in Exhibits ETR-26 and ETR-28." *Opinion No. 505*, 130 FERC ¶ 61,023 at P 108. The Louisiana Commission, however, did not object to the reversal of the Vidalia language as non-compliant, and this language remained in the System Agreement.

No. 13-60140 c/w No. 13-60141

b.    **Substantial evidence supports FERC's finding that the "reversal" language has a clear meaning.**

The Louisiana Commission contends that Entergy Corporation's transmittal letter was misleading as to whether there were any changes to the formula. Entergy Corporation's letter provided: "Related adjustments to exclude income tax savings associated with the Vidalia purchase power contract, and to reflect the reversal of the capital cost transaction regarding Vidalia on behalf of ELL also will be made, *consistent with Exhibits ETR-26 and ETR-28*" (emphasis added). The Louisiana Commission urges that, despite the unmistakable reference to an adjustment to "reflect the reversal of the capital cost transaction regarding Vidalia on behalf of ELL," the language "consistent with Exhibits ETR-26 and ETR-28" deceived it into believing no change was being made.

FERC found, however, that record evidence supports the conclusion that "the meaning of the phrase 'reversal of the Vidalia capital transaction'" is clear because the Louisiana Commission repeatedly had used the same terminology when referencing the Vidalia transaction's capital adjustments. *Opinion No. 514-A*, 142 FERC ¶ 61,013 at P 40. For example, when the Louisiana Commission approved the tax settlement, it instructed: "To the extent that ELI uses the Proceeds to reduce its outstanding debt, it will also reduce equity to maintain the pre-existing capital structure." Entergy then submitted testimony to the Louisiana Commission explaining its compliance with the terms of the commission's order adopting the settlement agreement: "The Company has complied . . . with regard to the use of proceeds from the Vidalia Tax Deduction . . . Specifically, this was accomplished *by reversing both debt and common equity related transactions identified as resulting from the application of the proceeds from the Vidalia Tax Deduction*." (emphasis added).

32

No. 13-60140 c/w No. 13-60141

Entergy Louisiana also submitted a filing to the Louisiana Commission documenting the reversal of the Vidalia transaction. Entergy Louisiana's submission contains an entry showing adjustments "to Eliminate Amounts Due Currently & *Reverse Vidalia Capital Transactions*" (emphasis added). Two of the adjustments are entitled "reverse Vidalia redemptions" and "reverse Vidalia reductions," and the filing contains a worksheet displaying the calculations. Indeed, the Louisiana Commission attached the schedule accompanying Entergy Louisiana's filing as part of its own presentation of exhibits. Accordingly, FERC's determination that the Louisiana Commission was a "highly informed party" that should have understood the meaning of the "reversal" language despite any apparent inconsistency between Exhibits ETR-26 and ETR-28 is supported by substantial record evidence. *Opinion No. 514-A*, 142 FERC ¶ 61,013 at P 40; *see U.S. Cellular Corp.*, 364 F.3d at 256.

Additionally, the Louisiana Commission's alleged surprise is belied by *Opinion Nos. 480* and *480-A*, to which Entergy conformed its compliance filings. In *La. 2008*, the D.C. Circuit affirmed FERC's rulings in those opinions: "In view of these considerations, and based on the record, FERC reasonably concluded that it would be inappropriate [t]o allow Louisiana to shift the escalating costs of the Vidalia contract to other states on the Entergy System and not accept responsibility for its own decision making." 522 F.3d at 396. The determination to exclude the Vidalia contract therefore was reflected in Entergy's initial compliance filings.

Accordingly, the Louisiana Commission was aware of the purported inconsistency between the reversal of the Vidalia transaction and Exhibits ETR-26 and ETR-28 when Entergy Corporation made its 2006 and 2007 compliance filings but failed to object to this language during those

33

No. 13-60140 c/w No. 13-60141

proceedings.[9] We cannot undo the *2006* and *2007 Compliance Orders* in this petition for review. *See, e.g.*, *Pac. Gas & Elec. Co. v. FERC*, 533 F.3d 820, 825 (D.C. Cir. 2008) ("With few exceptions, a challenge made outside of the statutory period is a collateral attack over which we have no jurisdiction."). Accordingly, we dismiss the Louisiana Commission's petition for lack of jurisdiction.

## CONCLUSION

For the above stated reasons, we DENY the Louisiana Commission's petitions in part and DISMISS in part.

---

[9] Entergy Corporation argued to FERC that "the reversal of the Vidalia capital transaction is consistent with Exhibit Nos. ETR-26 and ETR-28" because the "two exhibits were prepared in January of 2003 and were used during the hearing in Docket No. EL01-88-000 (the proceeding that eventually resulted in Opinion No. 480), which was held in July and August 2003." *Opinion No. 514*, 137 FERC ¶ 61,029 at P 66. These two exhibits could not have reflected the Vidalia transaction because the FERC order directing the reversal of the Vidalia transaction occurred "after the time period covered by Exhibit Nos. ETR-26 and ETR-28." *Id.* Entergy Corporation "contends that more significantly the Louisiana Commission's order approving Entergy's retail ratemaking adjustment that reversed the Vidalia capital transaction did not occur until May 2005, almost two and a half years after Exhibit Nos. ETR-26 and ETR-28 were prepared." *Id.*